**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| THE CINCINNATI SPECIALTY UNDERWRITERS INSURANCE COMPANY, <br> A Delaware Corporation, <br><br> Plaintiff, <br> v. <br><br> UNION STATION KANSAS CITY, INC., A Missouri Non-Profit Corporation, <br> Serve: National Registered Agents, Inc., 5661 Telegraph Road, Suite 4B <br> St. Louis, Missouri 63129, <br><br> THE CITY OF KANSAS CITY, MISSOURI <br> Serve: City Hall Law Department <br> 414 East 12th Street 23rd Floor <br> Kansas City, MO 64106, <br><br> THE GREATER KANSAS CITY SPORTS COMMISSION <br> A Missouri Non-Profit Corporation, <br> Serve: Registered Agent, Kathy Nelson <br> 1100 Walnut St., Suite 3450B <br> Kansas City, MO 64106 <br><br> KELI WENZEL D/B/A <br> O'NEILL EVENTS AND MARKETING <br> Serve: Keli Wenzel <br> 1607 Oak Street <br> Kansas City, Missouri 64108 <br><br> FLYOVER EVENT CO. LLC <br> Serve: Christopher M. Phelan <br> 10685 Riggs Drive, Overland Park, <br> Kansas 66212 <br><br> TERESA WHITE | Case No. |

)
Defendants. )

## COMPLAINT FOR DECLARATORY JUDGMENT

COMES NOW The Cincinnati Specialty Underwriters Insurance Company ("Cincinnati"), by and through undersigned counsel, and for its Complaint for Declaratory Judgment, states as follows:

## NATURE OF CASE

1. This is a declaratory judgment action brought pursuant to 28 U.S.C. §§ 2201, 2202, and Fed. R. Civ. P. 57 to determine Cincinnati's rights and obligations under a commercial general liability insurance policy ("the Cincinnati Policy or Policy") it issued to The Greater Kansas City Sports Commission ("GKCSC" or "Commission").

2. An actual and justiciable controversy exists between the parties. This action will resolve a dispute as to whether the Cincinnati Policy provides coverage to GKCSC as well as Union Station Kansas City Inc., ("Union Station"); The City of Kansas City, Missouri ("City"); Keli Wenzel d/b/a O'Neill Events & Marketing ("O'Neill");[1] Flyover Event Co. LLC ("Flyover") in connection with the underlying lawsuit filed by Teresa White against Union Station, GKCSC, The City, O'Neill, and Flyover, Case No. 2616-CV15935 (Jackson County, Missouri Circuit Court) ("the Underlying Lawsuit") on May 7, 2026. The Underlying Lawsuit seeks damages for the alleged injuries sustained by Teresa White who claims to have been knocked down and trampled by people attempting to flee during the mass shooting at which guns were fired and heard by the surrounding crowd causing the crowd to flee the gunfire at the Kansas City Chiefs Super Bowl

---

[1] Although Teresa White has named O'Neill Events & Marketing as a defendant, it is Cincinnati's understanding that O'Neill Events & Marketing is a fictitious name registered in the State of Missouri with a sole owner Keli Wenzel. For purposes of Cincinnati's Complaint for Declaratory Judgment, Cincinnati is referring to Keli Wenzel doing business as O'Neill Events & Marketing as "O'Neill").

2

Victory Rally ("Event" or "Rally") on February 14, 2024. The Underlying Lawsuit is styled *Teresa White v. Union Station, Kansas City, Inc., et al*.

3. Like six previously filed lawsuits ("State Lawsuits"), the Underlying Lawsuit relates to injuries claimed to arise out of the shooting that occurred on February 14, 2024 at the Rally.[2] Those six State Lawsuits are consolidated under the lawsuit styled *Erika Reyes et al. v. Dominic Miller et al.,* Case No. 2516-CV17538.

4. Furthermore, this action will resolve a dispute as to whether the Cincinnati Policy provides coverage to GKCSC with regard to a contractual indemnity claim made by Union Station concerning several jointly made claims for bodily injury or emotional distress/damage sent by several claimants ("Global Settlement Demand") to Union Station. Similar to the Underlying Lawsuit, the claims for bodily injury or emotional distress that allegedly arose out of the shooting that occurred at Rally shooting that occurred on February 14, 2024.

5. The Global Settlement Demand was made by Marc Anthony Galvan, Michael Galvan, Adriana Galvan, J.A., Chloe Pennington, Erika Reyes, M.R. 1, M.R. 2, M.R. 3, Kathleen Martinez, M.M. 1, M.M. 2, Esmerelda Ortiz, J.O., James Lemons, M.N., M.S., S.A., Jacob Gooch Sr. Emily Tavis, J.G. Marquita Johnson, Sydney Carlson, Amy Loveall, Sarai Holguin, Luis Angel, Marionna Miller (collectively referenced by "Global Settlement Demand Claimants").

**<u>PARTIES</u>**

---

[2] These six state lawsuits are listed as follows:

- *Abigail Salas-Zarate as next friend to S.A., v. The Greater Kansas City Sports Commission* (Case No. 2516-CV06384)
- *James Lemons v. The Greater Kansas City Sports Commission* (2516-CV06736)
- *Erika Reyes et al v. Dominic Miller et al* (Case No. 2516-CV17538)
- *Michael Galvan et al v. Union Station Kansas et al* (Case No. 2516-CV19394)
- *Alexandrea Springfield v. Union Station Kansas City, Inc., et al.* (Case No. 2516-CV41088)
- *MN., a minor by and through Next Friend Erika Nelson v. Union Station Kansas City, Inc., et al.* (2616-CV06346)

6. The Cincinnati Specialty Underwriters Insurance Company is a Delaware corporation with its principal place of business in Fairfield, Ohio.

7. The Greater Kansas City Sports Commission is a Missouri non-profit corporation and is incorporated in Missouri with its principal place of operation/business in Missouri. GKCSC may be served via its Registered Agent, Kathy Nelson, 1100 Walnut St., Ste. 3450B, Kansas City, Missouri 64106.

8. Union Station Kansas City, Inc., is a Missouri non-profit corporation organized under the laws of Missouri and is incorporated in Missouri with its principal place of operation/business in Missouri. Union Station may be served with process via its registered agent, National Registered Agents, Inc., at 5661 Telegraph Road, Suite 4B, St. Louis, Missouri.

9. The City of Kansas City, Missouri is a Missouri Charter City and may be served at City Hall Law Department, 414 East 12th Street, 23rd Floor, Kansas City, Missouri 64106.

10. O'Neill Events & Marketing, a fictitious name registered with the State of Missouri, and sole owner of O'Neill, Keli Wenzel, may be served with process at 1607 Oak Street, Kansas City, Missouri 64108. Keli Wenzel is an individual who is a citizen and resident of Missouri. Keli Wenzel is domiciled in Missouri.

11. Flyover Event Co., LLC is a limited liability company organized under the laws of the State of Kansas and is a citizen and resident of the State of Kansas. Flyover may be served with process via its Registered Agent, Christopher M. Phelan at 10685 Riggs Drive, Overland Park, Kansas 66212. Christopher M. Phelan is the only known member of Flyover. Christopher Phelan is an individual who is a citizen and resident of Kansas. Christopher Phelan is domiciled in the State of Kansas.

12. Teresa White is a citizen and resident of the State of Missouri.

4

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy is in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of costs, interest, and attorney's fees and there exists complete diversity of citizenship.

14. Venue is proper under 28 U.S.C. § 1391(b)(2) because the events giving rise to this lawsuit occurred in this Federal District.

## FACTUAL BACKGROUND

### The Cincinnati Policy

15. Cincinnati issued GKCSC a special event commercial general liability insurance policy, Policy No. CSU0225122, with a policy period from February 12, 2024, to February 17, 2024, and limits of insurance of $1,000,000 each occurrence, $5,000,000 general aggregate. ("the Cincinnati Policy"). A certified copy of the Cincinnati Policy is attached as Exhibit 1 and is incorporated into this Complaint as if fully set forth herein.

16. To the extent that there was any occurrence, there is only one occurrence.

17. The coverage provided by the Cincinnati Policy is subject to its terms, conditions, endorsements, limitations, and exclusions.

18. The Insuring Agreement of Coverage A of the Cincinnati Policy, Form CG 00 01 04 13, states in pertinent part as follows:

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. . . .

b.      This insurance applies to "bodily injury" and   "property damage" only if:

(1)      The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; [and]

(2)      The "bodily injury" or "property damage"   occurs during the policy period; . . .

(*See,* Ex. 1, at p. 21).

19.      The Cincinnati Policy contains an endorsement titled Exclusion – Personal and Advertising Injury, Form CG 21 38 11 85, which reads in pertinent part as follows:

This endorsement modifies the insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

COVERAGE B (Section I) does not apply and none of the references to it in the Coverage Part apply.

(*See,* Ex. 1, at p. 57).

20.      The Cincinnati Policy defines "bodily injury" and "occurrence" as follows:

**3.**      "Bodily injury" means bodily injury, sickness, or disease sustained by a person, including death resulting from any of these at any time.

. . .

**13.**      "Occurrence" means an accident, including continuous or repeated exposure to the same general harmful conditions.

(*See,* Ex. 1, at pp. 33 & 35).

21.      The Cincinnati Policy defines "you," "your," and "insured" as follows:

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. . . .

The word "insured" means any person or organization qualifying as such under Section **II** – WHO IS AN INSURED.

6

(*See,* Ex. 1, at p. 21).

22.     The "Who Is An Insured" provision of Form CG 00 01 04 13 of The Cincinnati Policy states in pertinent part as follows:

**SECTION II - WHO IS AN INSURED**

**1.**     If you are designated in the Declarations as: . . .

**b.**     A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.**     A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers. . . .

**d.**     An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

(*See,* Ex. 1, at p. 30).

23.     The "Who Is An Insured" provision of Form CG 00 01 04 13 of The Cincinnati Policy is modified by an Endorsement Form CSGA 434 11 08 ("Additional Insured Endorsement"), which states in pertinent part as follows:

**A.**     **SECTION II - WHO IS AN INSURED** is amended to include as an insured any person or organization described in Paragraph **B.** below (hereinafter referred to as additional insured) whom you are required to add as an additional insured under this Coverage Part by reason of a written contract or agreement is an insured, provided:

**1.**     The written contract or agreement is:

**a.**     Currently in effect or becomes effective during the policy period; and

7

**b.** Executed prior to an "occurrence" or offense to which this insurance would apply; and

**2.** They are not specifically named as an additional insured under any other provision of, or endorsement added to, this Coverage Part.

**B.** Only the following persons or organizations are additional insureds under this endorsement, but only with respect to liability caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf. Insurance coverage provided to such additional insureds is limited as provided herein:

**1.** The manager or lessor of a premises leased to you with whom you have agreed per Paragraph **A.** above to provide insurance, but only with respect to the ownership, maintenance or use of that part of a premises leased to you, subject to the following additional exclusions:

This insurance does not apply to:

**a.** Any "occurrence" which takes place after you cease to be a tenant in that premises.

**b.** Structural alterations, new construction or demolition operations performed by or on behalf of such additional insured.

**2.** Any person or organization from which you lease equipment with whom you have agreed per Paragraph **A.** above to provide insurance. However, this insurance does not apply to any "occurrence" which takes place after the equipment lease expires.

**3.** Any state or political subdivision which you have agreed per Paragraph **A.** above to provide insurance, subject to the following additional provision:

This insurance applies only with respect to the following hazards for which the state or political subdivision has issued a permit in connection with premises you own rent or control and to which this insurance applies:

**a.** The existence, maintenance, repair, construction, erection or removal of advertising signs, awnings, canopies, cellar entrances, coal holes, driveways, manholes, marquees, hoist

8

away openings, sidewalk vaults, street banners, or decorations and similar exposures; or

**b.** The construction, erection, or removal of elevators; or

**c.** The ownership, maintenance, or use of any elevators covered by this insurance.

**C.** With respect to the insurance afforded to these additional insureds, **SECTION III – LIMITS OF INSURANCE** is amended to include:

The limits applicable to the additional insured are those specified in the written contract or agreement or in the Declarations of this Coverage Part, whichever is less. If no limits are specified in the written contract or agreement, the limits applicable to the additional insured are those specified in the Declarations of this Coverage Part. The limits of insurance are inclusive of and not in addition to the limits of insurance shown in the Declarations.

**D.** With respect to the insurance afforded to these additional insureds, **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS, 4. Other Insurance** is amended to include:

Any coverage provided herein will be excess over any other valid and collectible insurance available to the additional insured whether primary, excess, contingent or on any other basis unless you have agreed in a written contract or written agreement executed prior to any loss that this insurance will be the primary. This insurance will be noncontributory only if you have so agreed in a written contract or written agreement executed prior to any loss and this coverage is determined to be primary.

(*See,* Ex. 1, at p. 62 – 63).

24. The Cincinnati Policy includes the Exclusion – Assault Or Battery Endorsement, Form CSGA 301 02 21 ("the Assault or Battery Exclusion"), which states in pertinent part as follows:

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A - Bodily Injury And Property Damage Liability and** Paragraph **2., Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability:**

**Assault Or Battery**

9

This insurance does not apply to "bodily injury" . . . that in any way, in whole or in part, arises out of an actual, threatened or alleged:

1. Assault or battery whether caused by or at the instigation or direction of any insured, their employees, patrons or any other person;

2. The failure of any insured or anyone else for whom any insured is legally responsible to prevent or suppress assault or battery; or

3. The failure to provide an environment safe from assault or battery, including but not limited to the failure to provide adequate security, or failure to warn of the dangers of the environment that could contribute to assault or battery; or

4. Failure to render or secure medical treatment or care necessitated by any assault or battery; or

5. Negligent investigation or reporting or failure to report any assault or battery to proper authorities; or

6. The negligent:

   a. Employment;

   b. Supervision;

   c. Training;

   d. Retention;

   of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by the **Assault Or Battery exclusion** above . . . .

C. Exclusion **2.a.** of the Commercial General Liability Coverage Form is deleted in its entirety and replaced by the following:

**2. a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured.

(*See,* Ex. 1, at p. 74).

### The Underlying Lawsuit

10

25.     Teresa White commenced the Underlying Lawsuit on May 7, 2026.

26.     The Teresa White's petition for damages ("Petition") in the Underlying Lawsuit brings forth a count of premises liability and a count of negligence against GKCSC, Union Station, the City, Flyover, and O'Neill ("Underlying Lawsuit Defendants").   A true and correct copy of the Petition is attached as Exhibit 2 hereto.

27.     The Petition alleges that on February 14, 2024, following the Kansas City Victory Parade, a Rally took place in front of Union Station. Petition ¶¶ 32, 34.

28.     The Petition alleges that amid the crowd, 12 people pulled out guns and at least 6 people fired an estimated 40 shots. Petition ¶ 4.

29.     The Petition alleges that at least 22 people were shot, 1 fatally. Petition ¶ 5.

30.     The Petition alleges that the guns were fired by young men wielding guns which were easily hidden and carried into the Rally that lacked adequate security measures.  The Petition called this a mass shooting. Petition ¶¶ 6, 9.

31.     The Petition alleges that when the guns were fired and heard by the surrounding crowd, the crowd reacted by frantically running in all directions away from the gunfire.  Petition ¶ 7.

32.     The Petition alleges that the Rally lacked physical security measures, such as checkpoints and metal detectors, which are necessary at mass gathering events that would have avoided this tragedy altogether. Petition ¶ 11.

33.     The Petition alleges that as a further result of the shooters, and the chaos they caused, Plaintiff was severely injured. Petition ¶ 12.

34.     The Petition alleges that as the crowd tried to escape, Teresa White was knocked down and trampled by people attempting to flee. Petition ¶ 8.

35. The Petition alleges that Teresa White suffered severe, permanent, and progressive injuries due to being trampled in the mosh pit of people running away from the shooters. Petition ¶ 13.

36. The Petition alleges that the mass shooting was foreseeable and entirely preventable. Petition ¶ 9.

37. The Petition alleges that the Rally had inadequate security measures, which left hundreds of thousands of invitees vulnerable. Petition ¶ 10.

38. According to the Petition, the Rally, where the subject incident occurred, was held on property owned by Union Station and the City and that the shooting took place in part on property owned by Union Station. Petition ¶¶ 37, 38.

39. According to the Petition, GKCSC, O'Neill, and Flyover coordinated with the City to plan the Rally and provide security. Petition ¶ 27.

40. The Petition alleges that Underlying Lawsuit Defendants breached their duties of care to Teresa White and that the incident and injuries were the direct and proximate result of negligence, carelessness, violations and failures of Underlying Lawsuit Defendants to exercise reasonable care, including, but not limited to:

    a.  Failing to adequately plan the security for the Rally;

    b.  Failing to adequately stage/employ SWAT Trained Officers around the venue;

    c.  Failing to maintain an adequate memorandum of understanding for partnerships with law enforcement;

    d.  Failing to provide effective communication to the public regarding overall potential risks to attending;

    e.  Failing to engage a spectator management plan (e.g., a plan for ticketing the event and admittance, inspection, ushering, seating/standing, public announcements, etc.);

f. Failing to engage in crowd management/crowd control with mechanisms used to maintain order or reinstate order, such as limited access control, admission control, and sufficient monitoring and policing (including failing to monitor and diffuse crowd tension);

g. Failing to have and adequately broadcast a plan for evacuation and exit management and to engage in safe evacuation to lead spectators away from violence;

h. Failing to implement a "Clear Bag Policy";

i. Failing to implement a list of prohibited items;

j. Failing to implement one or more security checkpoints;

k. Failing to implement a system requiring a free ticket to gain entry;

l. Failing to set up adequate physical security barriers such as Jersey barriers and cement barriers; and

m. Failing to maintain reasonable security equipment like scanning technologies, such as magnetometers or x-ray machines. Petition ¶ 54.

41. The Petition points to a prior event in front of Union Station where organizers implemented stringent security measures in contrast to the lack of such measures at the Rally. Petition ¶¶ 47 - 51.

42. The Petition alleges that Underlying Lawsuit Defendants owned, occupied, and or controlled the premises of the subject area, including Union Station's lot and surrounding area where the Subject Incident occurred. Petition ¶ 59.

43. The Petition alleges that Teresa White was an invitee of Underlying Lawsuit Defendants at all relevant times. Petition ¶ 60.

44. The Petition alleges that Underlying Lawsuit Defendants owed a duty to make the premises reasonably safe for lawful entrants such as Teresa White and to exercise ordinary care to protect said entrants from foreseeable risks of harm. Petition ¶ 61, 62.

13

45. The Petition alleged that Underlying Lawsuit Defendants failed to exercise reasonable care to prevent injuries to invitees of the Rally, increasing the risk to Teresa White. Petition ¶ 63.

46. The Petition alleges that the Underlying Lawsuit Defendants failed to use ordinary care in at least the following respects:

   a. Failing to adequately plan the security for the Rally;

   b. Failing to adequately stage/employ SWAT Trained Officers around the venue;

   c. Failing to maintain an adequate memorandum of understanding for the partnerships with law enforcement;

   d. Failing to provide effective communication to public regarding overall potential risks to attending;

   e. Failing to engage a spectator management plan (e.g., a plan for ticketing the event and admittance, inspection, ushering, seating/standing, public announcements, etc.);

   f. Failing to engage in crowd management/crowd control with mechanisms used to maintain order or reinstate order, such as limited access control, admission control, and sufficient monitoring and policing (including failing to monitor and diffuse crowd tension);

   g. Failing to have and adequately broadcast a plan for evacuation and exit management and to engage in safe evacuation to lead spectators away from violence;

   h. Failing to implement a "Clear Bag Policy";

   i. Failing to implement a list of prohibited items;

   j. Failing to implement one or more security checkpoints;

   k. Failing to implement a system requiring a free ticket to gain entry;

   l. Failing to set up adequate physical security barriers such as Jersey barriers and cement barriers; and

14

m. Failing to maintain reasonable security equipment like scanning technologies, such as magnetometers or x-ray machines.  Petition ¶ 64.

47.     The Petition alleges that as a direct and proximate result of the Underlying Lawsuit Defendants' negligence, carelessness, violations and omissions, Teresa White sustained severe physical injuries and emotional trauma. Petition ¶ 65.

48.     The Petition also alleges that Underlying Lawsuit Defendants were negligent in that they breached a duty to exercise ordinary care by various acts of commission and/or omission, including but not limited to:

a. Failing to provide a safe environment at the Rally;

b. Failing to provide adequate security at the Rally;

c. Failing to adequately hire security or safety personnel at the Rally;

d. Failing to provide adequate security or safety equipment at the Rally;

e. Failing to enact adequate security or safety policies and procedures at the Rally;

f. Failing to assure the attendees of the event were not armed with firearms and/or any weapons;

g. Failing to adequately hire medical personnel at the Rally;

h. Failing to have and/or enforce rules related to crowd behavior/crowd control at the Rally;

i. Failing to comply with applicable codes, regulations, and standards regarding safety at the Rally; and

j. Other acts or omissions deemed negligent. Petition ¶ 68.

49.     The Petition alleges that such negligence individually and/or in the aggregate proximately caused Plaintiff's injuries and resulting damages. Petition ¶ 69.

**Subsequent Demands**

15

50. On October 2, 2025, a demand letter was sent by the Ketchmark Firm ("October 2 Demand") to Union Station.

51. The October 2 Demand letter was provided to Cincinnati by GKCSC via email on October 27, 2025. The October 2 Demand Letter is Exhibit 3 to this Complaint for Declaratory Judgment.[3]

52. The October 2 Demand identified claims and claimants, some of which were not previously identified. The claimants in the October 2 Demand include the following:

    a. Lisa Lopez-Galvan was shot and died. October 2 Demand, pg. 5-6.

    b. Marc Anthony Galvan claims to have been shot at the Incident. October 2 Demand, pg. 7.

    c. Michael Galvan was Lisa Lopez-Galvan's husband who claims emotional damages arising from the shooting incident. October 2 Demand, pg. 7.

    d. Adriana Galvan was Lisa Lopez-Galvan's daughter who claims emotional damages arising from the shooting incident. October 2 Demand, pg. 7.

    e. J.A. claims to have been shot at the Incident. October 2 Demand, pg. 7.

    f. Chloe Pennington Claims to have been shot at the Incident. October 2 Demand, pg. 7-8.

    g. Erika Reyes claims to have been shot at the Incident. October 2 Demand, pg. 9-10.

    h. M.R. 1 claims to have been shot at the Incident. October 2 Demand, pg. 9-10.

---

[3] Cincinnati intends to file Exhibit 3 under seal once its contemporaneously filed Motion for Leave to File Exhibits Under Seal is granted by this Court.

i. M.R. 2 claims to have been shot at the Incident. October 2 Demand, pg. 9-10.

j. M.R. 3 claims emotional damages arising from the shooting. October 2 Demand, pg. 9-10.

k. Kathleen Martinez appears to claim Emotional damages arising from the shooting. October 2 Demand, pg. 10.

l. M.M. 1 claims emotional damages arising from the shooting. October 2 Demand, pg. 10.

m. M.M. 2 claims emotional damages arising from the shooting. October 2 Demand, pg. 10.

n. Esmeralda Ortiz claims Emotional damages arising from the shooting. October 2 Demand, pg. 10-11.

o. J.O. claims emotional damages arising from the shooting. October 2 Demand, pg. 10-11.

p. James Lemons claims he was shot at the Incident. October 2 Demand, pg. 11-12.

q. S.A. claims to have been shot at the incident. October 2 Demand, pg. 13.

r. M.N. claims to have been shot at the Incident. October 2 Demand, pg. 12.

s. M.S. Claims to have been shot at the Incident. October 2 Demand, pg. 12-13.

53. On October 22, 2025, the Ketchmark Firm sent Union Station a letter ("October 22 Letter"), which supplemented the October 2 Demand with additional information and other claimants who have not yet filed suit.

17

54.    The October 22 Letter was provided to Cincinnati by GKCSC via email on October 27, 2025. The October 22 Letter is Exhibit 4 to this Complaint for Declaratory Judgment.[4]  The claimants and their claimed damages, as listed in the October 22 Letter, are as follows:

  a.    Jacob Gooch Sr. claims he was shot at the Incident. October 22 Letter, pg. 2.

  b.    Emily Tavis claims she was shot at the Incident. October 22 Letter, pg. 2-3.

  c.    J.G. claims to have been shot at the Incident. October 22 Letter, pg. 3.

  d.    Marquita Johnson claims to have been shot at the incident. October 22 Letter, pg. 3-4.

  e.    Sydney Carlson claims to have been shot at the Incident. October 22 Letter, pg. 4.

  f.    Amy Loveall claims to have been shot at the Incident. October 22 Letter, pg. 4-5.

55.    On October 27, 2025, the Ketchmark Firm sent Union Station a letter ("October 27, Letter"), which further supplemented the October 2 Demand with additional information and other claimants who have not yet filed suit. The October 27 Letter is Exhibit 5 to this Complaint for Declaratory Judgment.[5]  The claimants and their claimed damages, as listed in the October 27 Letter, are as follows:

  a.  Sarai Holguin claims to have been shot at the Incident. October 27 Letter, pg. 2-3.

---

[4] Cincinnati intends to file Exhibit 4 under seal once its contemporaneously filed Motion for Leave to File Exhibits Under Seal is granted by this Court.
[5] Cincinnati intends to file Exhibit 5 under seal once its contemporaneously filed Motion for Leave to File Exhibits Under Seal is granted by this Court.

18

b. Luis Angel who claims to have been shot at the Incident. October 27 Letter, pg. 4.

c. While referenced in the October 27 Letter, Mariona Miller's claims are not described. A February 21, 2024, letter to Union Station from the Stockman firm indicates Ms. Miller was shot during the event.

56. Union Station subsequently sent a letter to the GKCSC on October 27th, 2025 ("October 27 Indemnification Request") with the October 2 Demand, October 22 Letter, and October 27 Letter enclosed, demanding indemnification pursuant to the Venue Agreement between Union Station and the GKCSC. The October 27 Letter was provided to Cincinnati by GKCSC via email on October 27, 2025.

57. The October 27 Indemnification Request is Exhibit 6 to this Complaint for Declaratory Judgment.[6] This October 27 Indemnification Request expresses that:

> Despite Union Station's demands to KCSC for defense and indemnity arising from a number of lawsuits and claims that have been made against it, KCSC has failed to honor the terms of the Agreement and is in breach of the same. In fact KCSC has been dismissed from at least the Galvan lawsuit, and I was told by counsel for the Galvan plaintiffs that the dismissal was because KCSC has no insurance coverage for the event. As you are aware KCSC's insurance carrier, Cincinnati Insurance Company, has declined it has coverage for any claims made for wrongful death or injury arising from shooting incident; coverage that was required by the Agreement giving KCSC use and control of the premises.

(October 27 Indemnification Request, pg. 2).

58. The October 27 Indemnification Request demanded that GKCSC "fully defend and indemnify Union Station, including but not limited to, responding to the enclosed demands on behalf of Union Station and honor its contractual obligation under the Agreement."

---

[6] Cincinnati intends to file Exhibit 6 under seal once its contemporaneously filed Motion for Leave to File Exhibits Under Seal is granted by this Court.

59. A subsequent lawsuit was filed in Jackson County on December 15, 2025, by Alexandria Springfield similarly claiming to have been knocked down by the crowd fleeing the shooting.

60. Another subsequent lawsuit was filed in Jackson County by M.N. which claims M.N. was shot during the event. M.N. filed an Amended Petition on March 23, 2026.

61. Union Station and the City have again separately tendered the claims arising from the shooting event to GKCSC requesting GKCSC indemnify Union Station and the City.

62. The most recent indemnity tenders by the City and Union Station were dated May 2026.

63. The subsequent indemnity tenders by the City and Union Station were similar to the prior tenders.

## Cincinnati does Not Owe Indemnity Or Defense

64. As noted above, Teresa White filed the Underlying Lawsuit on May 7, 2026.

65. With respect to GKCSC, GKCSC is the named insured pursuant to The Cincinnati Policy.

66. With respect to the City, Union Station, O'Neill, and Flyover, these parties are not named insureds pursuant to the Cincinnati Policy.

67. Cincinnati is aware of an agreement ("Venue Agreement"), effective on February 12, 2024, between GKCSC and Union Station, whereby GKCSC paid Union Station for use and access of the premises for the Rally. A true copy of the Venue Agreement is attached as Exhibit 7.

68. Pursuant to the Venue Agreement, GKCSC was required, in part and in certain circumstances to procure and maintain insurance throughout the life of the Venue Agreement.

Specifically, the Venue Agreement (referring to GKCSC as "KCSC" and Union Station as "USKC") requires:

    a. KCSC agrees that it shall have and maintain liability insurance in such types and amounts required by USKC, naming USKC as an additional insured on such insurance policies. KCSC shall provide US with a Certificate of Coverage to USKC's satisfaction prior to executing this Agreement.

    b. Kansas City Sports Commission shall procure a Special Event Liability Insurance (or similar CGL policy) with limits of $1,000,000 per occurrence and $5,000,000 in the aggregate, other than completed operations, and written on an "occurrence" basis. Damage to premises coverage of $500,000.

    c. The Commercial Special Event Liability Insurance (or similar CGL Policy) specified above shall provide that CONTRACTOR/VENDOR be named as additional insured for the services performed under this contract.

69. Furthermore, the Venue Agreement contains a reciprocal indemnity provision as follows:

    a. Without limitation to any other provision herein, KCSC hereby agrees to indemnify and hold harmless US, its affiliates and its employees, agents or representatives, against and from any and all liabilities; claims, demands, damages penalties, loss, cost or judgment (including without limitation, all costs of investigation, legal fees, and the cost of enforcing this indemnity) arising out of or resulting from KCSC's including without limitation any personal injury and/or property damage claims or any loss whatsoever incurred by US resulting in any way from KCSC's failure to comply with any of the terms under this Agreement. . . .

70. With respect to Union Station, Cincinnati has determined that Union Station qualifies as an additional insured pursuant to Additional Insured Endorsement of the Cincinnati Policy. Cincinnati also presumed, at least for the purposes of its duty to defend determination, that the allegations of the Petition satisfy the Insuring Agreement of Coverage A of the Cincinnati Policy. Notwithstanding, to the extent the Policy offers coverage to Union Station on an additional insured basis, such coverage is subject to all other terms, conditions, limitations, and exclusions contained in the Policy.

21

71. Paragraph D of the Additional Insured Endorsement expresses that any additional insured coverage provided by the Policy is excess over any other valid and collectible insurance available to the additional insured whether primary, excess, contingent or any other basis unless the GKCSC agreed in the Venue Agreement that the Policy's additional insured coverage would be primary. The Venue Agreement does not express that the required special event liability policy or similar commercial general liability policy be on a primary basis. Therefore, to the extent Union Station has its own separate insurance policy, such policy would be primary, and the Cincinnati Policy would be excess.

72. Union Station has also claimed that GKCSC must indemnify and defend Union Station for the claims made against Union Station.

73. Union Station's indemnity claim against the GKCSC does not claim an accident causing personal injury, bodily injury, or property damage.

74. Even if Union Station's indemnity claim against the GKCSC was claiming an accident causing bodily injury, the assault and battery exclusion would apply.

75. Even if Union Station's indemnity claim constitutes an insured contract, the exceptions to the Contractual Liability Exclusion, including the insured contract exception, do not create coverage for otherwise excluded liabilities.

76. The Policy contains an exclusion for Contractual Liability, which states in part:

**2.      Exclusions**

This insurance does not apply to: . . . .

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

(*See,* Ex. 1, at p. 22).

77. The Policy as amended by the Amendment of Insured Contract Definition Endorsement, Form CG 24 26 04 13, defines "insured contract" in pertinent part as follows:

"Insured contract" means: . . . .

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. However, such part of a contract or agreement shall only be considered an "insured contract" to the extent your assumption of the tort liability is permitted by law. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement. . . .

\* \* \*

(*See,* Ex. 1, at p. 51).

78. The insured contract provision is an exception to the Contractual Liability exclusion and does not create coverage.

23

79. Cincinnati is also aware of an agreement ("City Agreement"), effective February 6, 2024, between GKCSC and the City, whereby the City agreed to pay the GKCSC for its work on facilitating the Parade and Rally. A true copy of the City Agreement is attached as Exhibit 8 and is incorporated into this Complaint as if fully set forth herein.

80. Pursuant to the City Agreement, GKCSC (referred to in the City Agreement as "Contractor") was required to procure and maintain insurance throughout the duration of the City Agreement, insurance coverage with the City named as an additional insured. Specifically, the City Agreement requires:

A. Contractor shall procure and maintain in effect throughout the duration of this Contract insurance coverage not less than the types and amounts specified in this section. In the event that additional insurance, not specified herein, is required during the term of this Contract, Contractor shall supply such insurance at City's Cost. Policies containing a Self-Insured Retention are unacceptable to City unless City approves in writing the Contractor's Self-Insured Retention.

1) Commercial General Liability Insurance: with limits of $1,000,000 per occurrence and $2,000,000 aggregate, written on an "occurrence" basis. The policy shall be written or endorsed to include the following provisions:

a. Severability of Interests Coverage applying to Additional Insureds;

b. Contractual Liability;

c. Per Project Aggregate Liability Limit or Where not available, the aggregate limit shall be $2,000,000;

d. No Contractual Liability Limitation Endorsement; and

e. Additional Insured Endorsement, ISO form CG20 10, current edition, or its equivalent.

2) Special Event Liability Insurance (or similar CGL policy) with limits of $1,000,000.00 per occurrence and $5,000,000.00 in the aggregate, other than completed operations, and written on an "occurrence" basis. Damage to premises coverage of $500,000.00. This policy should include a Terrorism Risk rider based on the type of event.

24

3) Workers' Compensation Insurance: as required by statute including Employers Liability $1,000,000 accident with limits of $1,000,000 disease-policy limit; $1,000,000 disease-each employee.

4) Commercial Automobile Liability Insurance: with a limit of $1,000,000 per occurrence, covering owned, hired, and non-owned automobiles. Coverage provided shall be on an "any auto" basis and written on an "occurrence" basis. This insurance will be written on a Commercial Business Auto form, or acceptable equivalent, and will protect against claims arising out of the operation of motor vehicles, as to acts done in connection with the Contract, by Contractor.

5) If applicable, Professional Liability Insurance with limits per claim and annual aggregate of $2,000,000. . . .

81.     The City Agreement also requires the GKCSC to defend, indemnify, and hold harmless, the City from and against all claims arising out of or resulting from all acts or omissions in connection with the City Agreement caused in whole or in part by the GKCSC. Specifically, the City Agreement requires that:

> C.     Contractor shall defend, indemnify and hold harmless City from and against all claims arising out of or resulting from all acts or omissions in connection with this Contract caused in whole or in part by Contractor or Contractor's Agents, regardless of whether or not caused in party by any act or omission, including negligence, of City. Contractor is not obligated under this Section to Indemnify City for the sole negligence of City.

82.     With respect to the City, Cincinnati has acknowledged that the City is an additional insured. Notwithstanding, to the extent the Policy offers coverage to the City on an additional insured basis, such coverage is subject to all other terms, conditions, and exclusions contained in the Policy.

83.     To the extent the City claims that GKCSC must indemnify and defend the City for the claims made against the City, the City's indemnity claim against the GKCSC does not constitute an occurrence pursuant to the provisions, terms, conditions, and exclusions of the Cincinnati Policy.

84.     The City's indemnity claim against the GKCSC does not claim an accident causing personal injury, bodily injury, or property damage.

85.     Even if the City's indemnity claim against GKCSC was claiming an accident causing bodily injury, the assault and battery exclusion would apply.

86.     Even if the City's indemnity claim constitutes an insured contract, the exceptions to the Contractual Liability Exclusion, including the insured contract exception, do not create coverage for otherwise excluded liabilities.

87.     Paragraph D of the Additional Insured Endorsement expresses that any additional insured coverage provided by the Policy is excess over any other valid and collectible insurance available to the additional insured whether primary, excess, contingent or any other basis unless the GKCSC agreed in the City Agreement that the Policy's additional insured coverage be primary. The City Agreement does not express that the required special event liability policy or similar commercial general liability policy be on a primary basis.

88.     At this time, Cincinnati is unaware of any agreements between GKCSC and O'Neill or Flyover that would require GKCSC to obtain an insurance policy with O'Neill or Flyover named as additional insureds. Therefore, O'Neill and Flyover are not additional insureds under the Cincinnati Policy and therefore are not owed any coverage from Cincinnati.

89.     Even if O'Neill and Flyover were insureds, which they are not, the same policy provisions would apply such that there is no indemnity or defense owed to O'Neill and/or Flyover.

90.     The Policy includes the Exclusion – Assault Or Battery Endorsement, Form CSGA 301 02 21 (hereinafter, the "A/B Exclusion").

91.     The Policy does not provide coverage for, among other things, bodily injury that "in any way, in whole or in part, arises out of an actual, threatened or alleged assault or battery

whether caused by or at the instigation or direction of any insured, their employees, patrons or any other person"; failure of any insured or anyone else for whom any insured is legally responsible to prevent or suppress assault or battery; or failure to provide an environment safe from assault or battery, including but not limited to the failure to provide adequate security, failure to secure or render medical treatment, or failure to warn of the dangers of the environment that could contribute to assault or battery; or negligent employment, supervision, training, or retention of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by the A/B Exclusion.

92. The bodily injuries alleged in the Petition and those alleged in the October 2 Demand, October 22 Letter, October 27 Letter, and October 27 Indemnification Request are excluded by the assault and battery exclusion.

93. Therefore, Cincinnati Policy's Assault or Battery Exclusion applies and there is no indemnity or defense owed by Cincinnati.

94. Several claimants claim emotional injuries only. To the extent that a claimant only suffered emotional injury and not bodily injury, there would not be "bodily injury" caused by an "occurrence."

95. Due to the Cincinnati Policy's endorsement titled "Exclusion – Personal and Advertising Injury," which removes the Insurance Agreement of Coverage B from the Cincinnati Policy, the Cincinnati Policy owes no coverage for emotional injury. Therefore, Cincinnati would not owe any indemnity or defense.

96. Many of the claimants indicate that they were injured while leaving the celebration. If any of the claimed injuries did not take place at the special event, then there would not be indemnity or defense owed by Cincinnati.

27

## COUNT I – DECLARATORY JUDGMENT

97. Paragraphs 1 through 97 are hereby incorporated by reference.

98. There exists an actual controversy of a judiciable nature between the parties concerning the rights and obligations of the parties to the insurance contract.

99. This matter is ripe because there is a dispute regarding Cincinnati's exposure or duties in the settlement and/or adjudication of this matter.

100. Cincinnati has complied with all terms, conditions, and provisions of the insurance contract.

101. By virtue of the foregoing, a declaratory judgment is both necessary and proper to set forth and determine the rights, obligations, and liabilities that exist between the parties in connection with the aforementioned Policy.

## DEMAND FOR JURY TRIAL

Cincinnati hereby requests a jury trial on all triable issues.

WHEREFORE, Plaintiff, The Cincinnati Specialty Underwriters Insurance Company Prays that this Court enter judgment in its favor and against Defendants declaring:

A. That the Cincinnati Specialty Underwriters Insurance Company had/has no duty to defend Defendants, The Greater Kansas City Sports Commission, The City of Kansas City, Missouri, Union Station Kansas City, Inc., Keli Wenzel d/b/a O'Neill Events & Marketing, or Flyover Event Co. LLC under the Cincinnati Policy with respect to any claims asserted or which could have been asserted in the Underlying Lawsuit, or the losses claimed therein;

B. That the Cincinnati Specialty Underwriters Insurance Company has no duty to indemnify, or provide any other coverage to the Greater Kansas City Sports Commission, The City of Kansas City, Missouri, Union Station Kansas City, Inc., Keli Wenzel d/b/a O'Neill Events

28

& Marketing, Flyover Event Co. LLC, or Teresa White for claims, loss or damages in the Underlying Lawsuit;

C.  That the Cincinnati Specialty Underwriters Insurance Company has no duty to contribute any manner or amount to any settlement or proposed settlement of the Underlying Lawsuit; and

D.  For such other and further relief as the Court deems just, proper, and equitable.

**Respectfully submitted,**

LITCHFIELD CAVO LLP

By: */s/ Michael L. Brown*

| | |
|---|---|
| Michael L. Brown | MO #55732 |
| Anthony M. Hernandez | MO #69129 |
| Samuel A. Pomeroy | MO #75992 |

10401 Holmes Road, Suite 220
Kansas City, MO 64131
(816) 648-1400
(816) 648-1401 Fax
*Brown@litchfieldcavo.com*
*HernandezA@litchfieldcavo.com*
*Pomeroy@litchfieldcavo.com*
**ATTORNEYS FOR THE CINCINNATI SPECIALTY UNDERWRITERS INSURANCE COMPANY**

29

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that on June 11, 2026, this document, the original of which has been signed pursuant to Mo. R. Civ. Proc. 55.03(a), was filed using the Missouri Electronic Filing System which provides the required notice of filing and access to the document to registered users pursuant to Mo. R. Civ. Proc. 103.08:

_/s/ Michael L. Brown_

30